UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

VALENTINO NAPOLITANO,

                Plaintiff,

    - against –

TEACHERS COLLEGE, COLUMBIA UNIVERSITY,

                Defendant.

------------------------------------------------------------------x

Case No.: _____

**VERIFIED COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff VALENTINO NAPOLITANO ("Plaintiff"), by and through his attorneys, White, Hilferty & Albanese, P.C., hereby complains of Defendant, upon information and belief as follows:

## NATURE OF THE CASE

1. Plaintiff brings this action against Defendant alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, and the New York City Human Rights Law, N.Y. Admin Code 8-101, *et seq.* Plaintiff seeks damages to redress his emotional and financial losses which were inflicted by Defendant's unlawful retaliatory practices in violation of state and federal statutes.

## JURISDICTION & VENUE

2. Jurisdiction of this Court is proper under 42 U.S.C. § 2000, *et seq.*, and 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## PROCEDURAL REQUIREMENTS

5.     Plaintiff formally filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC").

6.     Plaintiff's formal complaint filed with the EEOC asserted the same factual allegations that are asserted herein this Complaint.

7.     Plaintiff received from the EEOC a notice of right to sue, dated July 31, 2019.

8.     Plaintiff has timely filed this action within ninety (90) days of receipt of said notice of right to sue.

9.     Plaintiff timely and properly filed this suit after exhausting all administrative remedies with the EEOC.

## THE PARTIES

10.     Plaintiff was and is a resident of the State of New York, County of Kings.

11.     Defendant is a graduate school of health, education and psychology in New York City and its principal administrative offices are located in New York County, New York.

12.     At all times relevant, Defendant owns, operates, and/or maintains its facilities in New York, New York.

## BACKGROUND

13.     Mr. Napolitano is a member of the International Brotherhood of Teamsters, Local 707 Union ("Union").

14.     In August 2014, former Assistant Vice President of Facilities Susan Joblanski contacted Mr. Napolitano regarding his application for a Steamfitter's position. Subsequently, Joblanski hired Mr. Napolitano as a Steamfitter at Teacher's College and assigned Vice President of Facilities Brian Alford as his direct supervisor.

15.     On September 16, 2014, Mr. Napolitano commenced his employment with Respondent.

## **MATERIAL FACTS**

16.   In late 2014, Joblanski spontaneously informed Mr. Napolitano that she was dissatisfied with Shop Steward Waverly Cannady and employee Jerry White and "needed to take action." Joblanski further stated "[White and Cannady] should not be there and should just retire."

17.   On June 29, 2016, Mr. Napolitano overheard a conversation between Joblanski and Dennis Dumas regarding White's failure to timely submit a work order. Joblanski stated that she was unable to issue White a citation based on this incident but instructed Dumas to assign White with more challenging tasks. If White was unable to complete these tasks within 30 minutes Joblanski would issue him a citation.

18.   In response to Joblanski's discriminatory statements against White based on age, Mr. Napolitano engaged in protected activity and reported her comments to Shop Steward Waverly Cannady. Mr. Napolitano told Cannady that Dumas and Joblanski attempted to force White out because of his age. Cannady informed Mr. Napolitano that he would promptly address the issue with Joblanski.

19.   After Cannady addressed the discriminatory statements with Joblanski, she immediately located Mr. Napolitano in the Engineering Shop and directed him to come into the hallway. Joblanski berated Mr. Napolitano by pointing her finger in his face and stated that he had no right to intrude on her private conversation with Dumas. Mr. Napolitano informed Joblanski that he was simply concerned about the welfare of his Union brother White. Joblanski replied that Mr. Napolitano's employment would not last if he continued such behavior and stated that "White [was] sick and needed help." Joblanski directed Mr. Napolitano to promise her that he would not repeat their discussion. Barry Sandy and

3

Tommy Fitzgerald witnessed the conversation. Joblanki's statement threatening Mr. Napolitano's employment evinces a retaliatory animus against him based upon his engagement in protected activity.

20. On July 13, 2016, Mr. Napolitano attended a meeting with Diversity Affairs Representative Janice Robinson, Joblanski and Cannady to discuss Joblanski's discriminatory statements. Absent any provocation, Robinson pointed her finger in Cannady's face and stated, "Let me tell you something, I am speaking to you now. I know where you want to go with this, you and me go back many years and this can be settled here and now." Ultimately, the discrimination issue went unaddressed and unresolved.

21. Upon information and belief, Joblanski informed Alford of Mr. Napolitano's engagement in protected activity against her and directed him to retaliate against Mr. Napolitano for same.

22. On July 25, 2016, Human Resources Representatives Netra Marcon and Misha Fekishazy met with Mr. Napolitano to discuss the June 19, 2016 incident and discussed Defendant's resistance to address Joblanski's discrimination against White. Marcon and Fekishazy informed Mr. Napolitano that they would investigate and interview the parties involved. Marcon prohibited Mr. Napolitano from discussing the matter further with anyone else.

23. On August 1, 2016, Mr. Napolitano removed an old duct and an old electrical line from the ceiling. Per his agreement with Joblanski and Alford, Mr. Napolitano was permitted to work overtime hours in order to upgrade the shop and install a cooling unit to improve proper ventilation and air quality. However, Defendant retaliatorily denied Mr. Napolitano overtime hours.

4

24.     On September 12, 2016, Alford interfered with Mr. Napolitano's leadership and ordered McCook to install a valve that Mr. Napolitano was originally scheduled to install six weeks prior. Mr. Napolitano repeatedly requested that Respondent refrain from assigning McCook certain tasks because he did not possess the proper experience and knowledge on how to calibrate the valve as required by Article 33 of the CBA; however, Alford ignored Mr. Napolitano's reasonable concerns.

25.     On September 13, 2016, Mr. Napolitano met with Alford and Cannady to discuss Alford's unprofessional comments. Specially, Alford told McCook that, "Mr. Napolitano thinks he is the boss but little does he know [Alford] is the boss." Alford also falsely informed McCook that Mr. Napolitano did not know how to order material.

26.     On September 14, 2016, Mr. Napolitano met with Human Resources to discuss any updates on Joblanski's age discrimination against White. Mr. Napolitano also informed Fekishay that Alford and the 28 Management facility retaliated against him as a result of the complaint.

27.     On October 6, 2016, Alford and Dumas assigned Mr. Napolitano and McCook to a project and intentionally failed to inform them of critical information regarding the active steam system. While Mr. Napolitano and McCook worked on the system, live steam practically burned Mr. Napolitano's face. Mr. Napolitano immediately contacted Cannady to shut down the zone line before the area filled with steam. Alford placed Mr. Napolitano in a precarious situation based on their retaliatory animus against him for his engagement in protected activity.

28.     On October 10, 2016, Defendant removed the radiators in the shop but failed to clean up the debris and water bugs as Alford and Joblanski agreed to. Mr. Napolitano contacted

Alford to sanitize the shop; however, Alford refused to answer his calls and intentionally excluded him from daily operations.

29. On October 19, 2016, Joblanski, Alford and Dumas assigned the HVAC team and Boiler Mechanic to a training program regarding a new operation system; however, intentionally excluded White from the training class based on his age. Barry Sands and Angel Pagna witnessed this incident.

30. On October 25, 2016, Alford asked Mr. Napolitano to fix a ceiling leak but refused to provide him with the appropriate safety equipment in retaliation to his complaint of discrimination on behalf of White. Mr. Napolitano reasonably denied the assignment based strictly on fear for his safety. Alford falsely accused Mr. Napolitano of improperly refusing a work order despite his awareness of the safety risks. Mr. Napolitano notified the Director of Environmental Health and Safety Patrick Mathelier about the situation.

31. On November 1, 2016, Mr. Napolitano explained to Mathelier that Alford ordered him to repair a ceiling return line without scaffolds or a harness. When Mr. Napolitano reasonably requested scaffolds and an open ceiling, Alford replied that was it was his responsibility. Subsequently, Mr. Napolitano inquired with Cannady how he should proceed and Cannady instructed him to complete the task despite the safety risks. Mr. Napolitano called Alford multiple times for instructions; however, Alford intentionally refused to answer his calls. Mr. Napolitano proceeded and noticed asbestos throughout the entire ceiling. Since Alford ignored Mr. Napolitano's calls, Mr. Napolitano addressed the situation with John Olsen who informed him to completely shut down the project and tape the area off.

32. On November 3, 2016, Alford directed Mr. Napolitano that from then on he would only provide Mr. Napolitano with work orders that he thought he should work on. Subsequently,

Alford provided Mr. Napolitano with a work order for duct work on the shop's air conditioning unit. Pursuant to their original agreement, Mr. Napolitano would only perform shop work if Respondent cleaned the area of all grease, water bugs and debris. Alford directed Mr. Napolitano to perform the work and claimed that the assignment did not pose a health hazard. Alford intentionally assigned Mr. Napolitano this task so that he would be unable to attend steam calls during the heating season. After, Mr. Napolitano contacted Human Resources to discuss Alford's harassment and retaliation that included unsafe assignments, threats of suspension for failure to follow orders and failure to provide proper ventilation.

33. On November 7, 2016, Alford demanded that Mr. Napolitano provide separate time sheets indicating his morning rounds, the amount of time each took and the location of each assignment. Alford unreasonably requested this information despite it already being in the computer system. Notably, Alford did not require any other employee to provide him with such information. Subsequently, Alford refused to sign Mr. Napolitano's material list and alleged that he failed to provide his morning round locations.

34. On November 8, 2016, the 28 Management office summoned Mr. Napolitano to a meeting with Alford, Olsen and Cannady regarding Alford's false and retaliatory insubordination accusations against him. Alford alleged that Mr. Napolitano failed to follow work orders and refused to follow verbal instructions. Respondent advised Mr. Napolitano that the meeting constituted as a verbal warning. Thereafter, Alford handed Mr. Napolitano work order #0004520 for his morning rounds and instructed him to write everything he did during his morning rounds, including the locations, room number, troubleshooting and visual detail inspection.

35.   On November 9, 2016, Fekishazy and Marcon held a meeting and informed Mr. Napolitano that Respondent closed White's case and prohibited anyone from speaking about it again. Fekishazy and Marcon then interrogated Mr. Napolitano about Alford's false allegations of insubordination.

36.   On November 10, 2016, Mr. Napolitano confided in Cannady that he believed White feared retaliation from Respondent if he reported 28 Management's discriminatory practices. Mr. Napolitano expressed his sincere concern and commitment to protect White from further discrimination without adverse employment actions.

37.   On November 14, 2016, Alford issued Mr. Napolitano a work order to conduct work on a steam line covered in fiber glass insulation where Mr. Napolitano discovered asbestos material underneath. While Mr. Napolitano spoke to Painter James Jimenez, Alford interrupted and stated that there was no asbestos. Mr. Napolitano asked how he knew just by looking at it and Alford replied, "because I know." Nevertheless, Mr. Napolitano removed and replaced the radiator in that area. Based on Alford's unreasonable refusal to appropriately test the area, Mr. Napolitano was unable to ascertain whether he experienced exposure to asbestos. The area was later tested and returned positive for asbestos.

38.   On November 18, 2016, Mr. Napolitano filed a grievance complaint with his Union based on Alford's unrelenting retaliation. Subsequently, Alford summoned Mr. Napolitano to the 28 Management facility. Upon his arrival, Alford, Kevin Waldron and Cannady handed Mr. Napolitano a letter that stated he submitted improper time sheets. Alford informed Mr. Napolitano that pursuant to the policy, Defendant required him to hand in time sheets and work orders every night. Mr. Napolitano requested to review the policy; however, Alford replied that Defendant maintained a "verbal" policy. This is another example of Mr.

8

Napolitano being singled-out motivated by retaliation to his engagement in protected activity.

39. On November 21, 2016, Alford argued with Mr. Napolitano over the proper way to remove asbestos material. Alford stated, "You're getting me upset. You wouldn't like when I'm upset." This statement reflected the second time that Alford threatened Mr. Napolitano. Alford told Mr. Napolitano that he was the "alpha." This statement reflected one of several times that Alford abused his power in order to degrade Mr. Napolitano.

40. On November 22, 2016, Mr. Napolitano met with Cannady and his Union Representative Danny Pacheco regarding Respondent's retaliation. Mr. Napolitano also complained about Alford's intentional failure to answer his radio calls and allow him to perform job duties.

41. On November 23, 2016, Joblanski reported to Pacheco that Mr. Napolitano failed to timely submit his time sheet the previous night. Mr. Napolitano clarified that he always submitted his time sheet to McCook every night before he left. Pacheco relayed this information to Joblanski and informed her that the Union was aware of the retaliation that Mr. Napolitano was routinely subjected to.

42. On December 13, 2016, Pacheco met with Joblanski and Alford to address their retaliation against Mr. Napolitano. Cannady was also present for this meeting. Prior to the meeting, Mr. Napolitano explained to Pacheco that Alford required him to perform duties outside the scope of his employment as retaliation for his complaints submitted on behalf of White.

43. On December 15, 2016, Joblanski informed the engineering shop employees that she would be relocating their lockers. Mr. Napolitano replied that Defendant made an unfair decision because the shop was there for the past 17 years. Weller, McCook, Sands and Fitzgerald witnessed Joblanski's announcement. Later that afternoon, Fitzgerald informed Mr.

Napolitano that Joblanski randomly requested that Fitzgerald write a sworn affidavit that Mr. Napolitano threatened her. Joblanski falsely informed employees that Mr. Napolitano threatened her. Mr. Napolitano immediately complained to Cannady and Pacheco.

44.   On January 5, 2017, Mr. Napolitano met with Joblanski, Pacheco and Cannady to discuss Alford's retaliation and the scope of Mr. Napolitano's job duties. During the meeting, Joblanski was visibly hostile towards Mr. Napolitano and alleged that she felt threatened by him. By the end of the meeting, Joblanski and Mr. Napolitano resolved their differences.

45.   On January 13, 2017, Alford ordered Mr. Napolitano to investigate a steam leak, when Mr. Napolitano arrived he informed Alford that he and McCook would locate the shutoff valve in the basement. Weller overheard Alford mockingly state that Mr. Napolitano would be unable to locate the valve.

46.   On February 17, 2017, in further retaliation against Mr. Napolitano, Alford gave him a letter regarding respirator testing for employees. Alford intentionally highlighted the words "clean shaven." Upon receipt of the letter, Mr. Napolitano explained to Mathelier that he maintained a beard since the beginning of his employment and that the letter violated his civil rights. Later that afternoon, Joblanski informed Mr. Napolitano that she knew he always had a beard and sarcastically stated, "Yup, team Valentino."

47.   From March 7, 2019 until March 9, 2017, Alford was on vacation. In his absence, Alford instructed Olsen to issue Mr. Napolitano work orders to remove old radiators from Grant Hall and Sarasota Hall and to store them in Whitter Hall. During this time, Mr. Napolitano's partner McCook was also on vacation so Mr. Napolitano was forced to work alone. Grant Hall and Sarasota Hall are located approximately one and one half blocks away from each other. Mr. Napolitano told Olsen that he did not mind the work but that the job could not

be completed by only one person. Olsen advised Mr. Napolitano to call "Kevin's guys" for assistance; however, they were unavailable. Olsen contacted Cannady, who informed him that the order was not a one-man job and that it would have to wait until McCook returned to work. Alford's unreasonable work order further evinces the retaliatory actions against Mr. Napolitano based on his engagement in protected activity on behalf of White.

48.    On March 9, 2017, Pacheco contacted Joblanski to discuss Alford's unreasonable assignments despite his awareness that Mr. Napolitano's partner was on vacation. Pacheco and Cannady informed Mr. Napolitano that as long as the radiators remained connected, it would not be his responsibility. They also suggested that Mr. Napolitano address the December 15, 2016, incident with Joblanski regarding the request that she made to Fitzgerald. Joblanski denied any allegations and asked who provided Mr. Napolitano with said information and to tell the source, "They're full of fucking shit." At the end of the discussion, Joblanski told Mr. Napolitano that she was pleased with his performance.

49.    On March 16, 2017, Mr. Napolitano went to the 28 Management office to pick up his work orders from Alford. Alford abruptly shouted, "What do you want?" Mr. Napolitano advised him that he worked on the radiators in Grant and Sarasota Halls and to avoid any further hostility. Mr. Napolitano walked towards Joblanski's office and Alford screamed, "Yeah, go ahead!"

50.    On April 24, 2017, McCook informed Mr. Napolitano that Alford and Luis Calle privately offered him overtime hours. In further retaliation, Alford intentionally continued to deprive Mr. Napolitano of overtime opportunities despite his seniority.

51.    On May 23, 2017, Mr. Napolitano commenced a trade meeting with all trade departments and Joblanski to address Alford's egregious acts. Mr. Napolitano discussed job description

limitations, improper compensation for contractor work, backlash from denying work that was outside the scope of his employment, Alford's harassment and threats about future opportunities and Alford's failure to follow safety protocol. At the end of the meeting, Joblanski informed everyone that after the holiday, a second meeting would be held with Alford.

52.   On May 31, 2017, Respondent conducted a subsequent trade meeting with Alford present. Mr. Napolitano, Sands and Fitzgerald voiced their concerns; however, Respondent failed to ameliorate the situation.

53.   On June 1, 2017, Pacheco and Cannady offered Mr. Napolitano a Facilities Assistant Shop Steward position in order to represent Respondent's employees. Mr. Napolitano graciously accepted this position.

54.   On June 5, 2017, Mr. Napolitano represented Plumber Charlie in his discrimination and harassment claims against Alford and Yuri.

55.   From August 24, 2017 until August 28, 2017, Alford continued to demand that Mr. Napolitano perform unreasonable tasks outside of his job description. Mr. Napolitano reported these incidents to Cannady.

56.   From August 2017 and September 2017, Joblanski left her employment with Defendant and Respondent promoted Alford to Assistant Vice President of Facility Management.

57.   On September 11, 2017, Defendant held an investigatory meeting with Mr. Napolitano, Randy Glazer, Cherie Magost, Kevin Waldron and Cannady regarding Alford's false claims of insubordination against Mr. Napolitano. However, Defendant failed to address any of Mr. Napolitano's complaints of Alford's retaliatory behavior.

58.     On September 21, 2017, Defendant wrongfully suspended Mr. Napolitano based on unsubstantiated allegations of insubordination. Mr. Napolitano was unlawfully suspended from October 3, 2017 until October 5, 2017 and October 10, 2017 until October 11, 2017.

59.     On November 17, 2017, Calle falsely accused Mr. Napolitano of insubordination for allegedly failing to complete a work order.

60.     On December 13, 2017, Defendant issued Mr. Napolitano a 10-day suspension letter for for his alleged insubordination on November 17, 2017. Respondent wrongfully suspended Mr. Napolitano from January 2, 2018 until January 16, 2018.

61.     On January 17, 2018, Mr. Napolitano retuned to work. Calle informed Mr. Napolitano that needed to return tomorrow and that the Union should have contacted him. Mr. Napolitano left the premises and contacted Pacheco to notify him of the situation. Mr. Napolitano also contacted Human Resources to report the incident. Mr. Napolitano grieved his suspension through his Union.

62.     On January 18, 2018, Mr. Napolitano was scheduled to meet with Marcon, Pacheco and Cannady; however, Marcon advised them that they allegedly missed the meeting. Later, Mr. Napolitano learned that during his suspension, Defendant afforded McCook with overtime opportunities. In addition, to avoid insubordination, Mr. Napolitano checked in with Calle to ensure that he followed his work orders; however, Calle advised him that he did not want to be involved.

63.     On February 2, 2018, Calle threatened Mr. Napolitano with corrective action if he did not wear his uniform. Alford and Calle were aware that Mr. Napolitano was unable to wear the specific uniform due to his Psoriasis.

64. On March 12, 2018, Cannady informed Mr. Napolitano that Respondent decided to conduct an investigatory meeting to determine the false accusations of insubordination against him. The meeting continued until March 13, 2018; however, Mr. Napolitano refused to sign the investigatory report because the allegations within were falsified.

65. On March 15, 2018, Mr. Napolitano contacted Human Resources Representative Hargat and requested his personnel file; however, Hargat stated that she would need to schedule a review date.

66. On March 19, 2018, Respondent wrongfully terminated Mr. Napolitano's employment in retaliation for the age discrimination complaint that he filed on behalf of White and for his personal complaints and grievances regarding Alford's retaliatory conduct.

67. Based on the foregoing, Respondent retaliated against Mr. Napolitano based upon his complaints of age discrimination on behalf of a colleague and his personal complaints and Union grievances regarding Alford's retaliatory behavior.

## AS A FIRST CAUSE OF ACTION FOR RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

68. Plaintiff repeats, re-alleges and reaffirms each and every allegation in paragraphs above as if said paragraphs were more full set forth herein at length.

69. Title VII prohibits retaliation.

70. 42 U.S.C. § 2000e-3(a) provides in pertinent part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any

14

member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

71. Defendant's employment practices as alleged at length herein constitutes an impermissible act of retaliation in violation of Title VII. The stated reasons for Defendant's conduct were not the true reasons, but served as a pretext to conceal Defendant's retaliatory animus.

72. Plaintiff engaged in protected activity when he filed a formal age discrimination complaint against Defendant on behalf of his colleague Jerry White opposing the Defendant's discriminatory conduct. Moreover, Plaintiff engaged in protected activity when he filed personal complaints and grievances regarding Alford's retaliation. Plaintiff's opposition of discrimination on behalf of Jerry White and initiating a proceeding by complaining of retaliatory conduct pursuant to Respondent's policies and procedures constitutes as a protected activity under Title VII.

73. Defendant was notified of Plaintiff's engagement in protected activity when he filed a complaint of age discrimination on behalf of White to Cannady who addressed the situation with Joblanski. Joblanski then confronted Plaintiff about the complaint and Defendant held multiple meetings thereafter regarding the incident as described above in further detail. In response to Plaintiff's complaint, Defendant engaged in a plethora of retaliatory conduct.

74. As fully demonstrated within this Complaint, Respondent engaged in a course of retaliatory and adverse conduct by (1) excluding Plaintiff from overtime opportunities; (2) routine threats of suspension based on unsubstantiated allegations of insubordination; (3) requiring Plaintiff to perform duties outside the scope of his employment; (4) disregarding safety

15

protocol in relation to tasks assigned to Plaintiff; (5) publicly brandishing Plaintiff as the only employee required to provide additional timesheets; (6) wrongfully suspending Plaintiff; and (7) unlawfully terminating Plaintiff's employment.

75. As a result of the foregoing, Plaintiff experienced financial loss, his health was threatened by exposure to asbestos/unsafe working conditions, and he sustained serious emotional distress.

## AS A THIRD CAUSE OF ACTION FOR RETALIATION
## UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

76. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

77. The New York City Human Rights Law, N.Y. Admin Code 8-101 provides, in pertinent part: "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter. The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity."

78. Defendant's employment practices as alleged at length herein constitutes an impermissible act of retaliation in violation of The New York City Human Rights Law. The stated reasons

for Defendant's conduct were without merit and served as a manufactured basis to conceal Defendant's retaliatory animus.

79. Plaintiff engaged in protected activity when he filed a formal age discrimination complaint against Respondent on behalf of his colleague Jerry White. Moreover, Plaintiff engaged in protected activity when he filed personal complaints and grievances in connection with Alford's retaliation. Initiating a proceeding by properly filing of a retaliation complaint pursuant to Respondent's policies and procedures constitutes as a protected activity under The New York City Human Rights Law.

80. Respondent was notified of Plaintiff's engagement in protected activity when he filed a complaint of age discrimination on behalf of White. In response to Plaintiff's complaint, Respondent created a retaliatory, hostile and adverse work environment for Plaintiff.

81. As fully demonstrated within this Complaint, Respondent engaged in a course of retaliatory and egregious conduct by (1) excluding Plaintiff from overtime opportunities; (2) routine threats of suspension based on unsubstantiated allegations of insubordination; (3) requiring Plaintiff to perform duties outside the scope of his employment; (4) disregarding safety protocol; (5) publicly brandishing Plaintiff as the only employee required to provide additional timesheets; and (6) wrongfully terminating Plaintiff's employment.

82. As a result of the foregoing, Plaintiff experienced financial loss, his health was threatened by exposure to asbestos/unsafe working conditions, and he sustained serious emotional distress.

**WHEREFORE,** Plaintiff respectfully requests a judgment against Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, the New York State Human

Rights Law, N.Y. Exec. Law 296. *et seq*., and the New York City Human Rights Law, N.Y. Admin Code 8-101, *et seq.* by retaliating against Plaintiff on the basis of his engagement in protected activity;

B.    Awarding damages to the Plaintiff, resulting from Defendant's unlawful retaliation and to otherwise make him whole for any losses suffered as a result of such unlawful employment practice;

C.    Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

D.    Awarding Plaintiff punitive damages;

E.    Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F.    Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated: New York, New York
       October 15, 2019

Respectfully submitted,

/s/*Michael P. Hilferty*
Nina A. Ovrutsky
White, Hilferty & Albanese
*Attorneys for Plaintiff*
570 Lexington Avenue, 16th Floor
New York, New York 10022
Ph: (646) 690-8881

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
VALENTINO NAPOLITANO,

                  Plaintiff,                        **VERIFICATION**

        -against-

TEACHERS COLLEGE, COLUMBIA UNIVERSITY
                  Defendant(s).
-------------------------------------------------------------------X

      VALENTINO NAPOLITANO, pursuant to the provisions of 28 U.S.C. 1746, declares the following under penalty of perjury that the foregoing is true and correct:

1. I am the Plaintiff herein.

2. I have read the foregoing Complaint and know the content thereof, that the same is of my own knowledge except as to the matters therein stated upon information and belief; and that as to those matters, I believe the same to be true.

Executed :    New York, New York
               October 15, 2019

                                      Valentino Napolitano, Plaintiff